(October 18, 2007)

■ MADISON HUDSON ASSOCIATES LLC et al., Appellants, v JOSEPH NEUMANN et al., Respondents. [843 NYS2d 589]—

Order, Supreme Court, New York County (Charles E. Ramos, J.), entered July 8, 2006, which (1) granted the motion of defendants-respondents Joseph Neumann, Charles Herzka and David Weldler (collectively, the Neumann defendants) for summary judgment to the extent of dismissing the first, second, third, fourth, fifth (except to the extent it seeks an accounting relating to the operations of the parking lot prior to the sale of the leasehold), eighth (except to the extent it seeks to recover the reasonable value of certain services performed by Robert Gladstone) and tenth causes of action against those defendants, and (2) granted the motion of defendants-respondents William Achenbaum, Achenbaum Family Partnership, L.P. and Gansevoort Hotel LLC (collectively, the Achenbaum defendants) for summary judgment dismissing the amended complaint as against those defendants, unanimously modified, on the law, to the extent of permitting plaintiff Madison Hudson Associates, LLC (Madison Hudson), to seek recovery under the portion of the fifth cause of action for an accounting for its 15% share of any profits from the sale of the subject property, and otherwise affirmed, without costs.

This action involves a dispute between members of Hudson Green, LLC (Hudson), an entity that was formed in connection with the development of a then-undeveloped parcel of land in Manhattan located at Ninth Avenue and West 13th Street (the property). Hudson's sole asset, which it acquired in April of 1999, was a 99-year leasehold interest in the property. In addition to the Neumann defendants, which owned an 85% interest in Hudson, the other member of Hudson, owning a 15% interest, was plaintiff-appellant Madison Hudson, an entity formed in April of 1999 by plaintiff-appellant Madison Equities, LLC (Madison Equities). When their efforts to develop the property into a hotel were unavailing, Madison Hudson and the Neumann defendants entered into discussions in 2000 relating to the potential purchase of the Neumann defendants' interest in Hudson (and thus in the development of the property). Three letter agreements resulted from these negotiations.

Pursuant to the first of these agreements, dated June 2, 2000, Madison Hudson was given until July 18, 2000 to notify the Neumann defendants of its intent to purchase the interests of the Neumann defendants for $5 million, with a closing to occur

by no later than August 22, 2000. If Madison Hudson did not so notify the Neumann defendants by July 18 and make a specific deposit on the purchase price, paragraph 5 of the agreement provided that the Neumann defendants were "free to sell to anybody any time." Paragraph 5 is ambiguous with respect to whether the Neumann defendants were free to sell to anyone merely their interest in Hudson or Hudson's entire interest in the leasehold. Paragraph 7 of the agreement suggests the latter was intended, but we need not resolve the issue.

The transaction contemplated by the June 2 agreement did not occur. However, the same parties entered into a second letter agreement on October 20, 2000. This agreement recited that Madison Hudson owned 15% of Hudson, that the Neumann defendants owned the balance, and that the parties were engaged in negotiations over the terms of an acquisition by Madison Hudson of all or part of the interest of the Neumann defendants in Hudson. Although a closing was to occur on November 6, 2000 if a written agreement was reached, neither party was obligated to consummate the transaction. Rather, each party had the right to cease negotiations "for any or no reason." However, Madison Hudson was obligated to make, on behalf of Hudson, a payment of $500,000 that was due under the lease on October 22, 2000 to the owner of the property. This payment was to be deemed a capital contribution by Madison Hudson. Without specifying when capital contributions were to be distributed, paragraph 3 of the agreement provided for the distribution of all capital contributions "on a *pari passu* basis" to the owners of the company. No reference was made in the October 20 agreement to the Neumann defendants' right to sell "to anybody any time" under the contingencies specified in the June 2 agreement.

Although Madison Hudson made the $500,000 payment required by the October 20 agreement, the contemplated acquisition of all or part of the Neumann defendants' interest did not occur. On November 13, 2000, however, the parties entered into their third and final letter agreement. This appeal turns on the terms of that agreement, and particularly paragraph 4 thereof. After specifying that Madison Hudson owned a 15% interest in Hudson and that the Neumann defendants, collectively referred to as "Broadway" in light of their positions as principals of Broadway Management Co., Inc., owned the remaining 85% interest, paragraph 2 of the agreement obligated Madison Hudson to make an immediate, additional capital contribution of $500,000 that was to be distributed immediately to Broadway. Paragraph 5 of the agreement provided that upon

the making of the additional contribution and its distribution to Broadway, the aggregate capital contribution of Broadway would be approximately $900,000 and the aggregate capital contribution of Madison Hudson would be $1 million. Paragraph 3 noted that the parties, along with Times Square Partners LLC (TSP), were negotiating the terms of an acquisition, denominated as the "Transaction," by TSP and Madison Hudson of all or part of Broadway's interest in Hudson.

Paragraph 4 reads in full as follows: "4. In the event the closing of the Transaction does not occur by November 22, 2000, Broadway, at its option, shall be free to cease negotiations with TSP and Madison [Hudson] regarding the Transaction, and thereafter, neither Broadway nor TSP or Madison [Hudson] shall have any obligations to the other to consummate the Transaction and Broadway shall have the right, at its option, to market and sell the property (the 'Property') owned by [Hudson] to any third-party. Notwithstanding the foregoing, if the closing of the Transaction shall fail to occur by November 22, 2000, Broadway shall undertake, prior to February 22, 2001, to cause the Property to be marketed for sale in a bona fide arms-length transaction to any unrelated third-party. If Broadway shall not have caused the Property to be so marketed on or before February 22, 2001, Broadway shall cause [Hudson], within . . . two (2) business days after February 22, 2001 or if Broadway has so caused the Property to be marketed, . . . two business days after the cessation of said marketing effort, whichever is later[,] to distribute, by wire transfer of immediately available funds, to Madison [Hudson] the outstanding amount of Madison[ ] [Hudson's] capital contributions to [Hudson]. Notwithstanding the foregoing, it is understood Broadway shall have the right, at any time, to cause [Hudson] to distribute, by wire transfer of immediately available funds, to Madison [Hudson] the outstanding amount of Madison[ ] [Hudson's] capital contributions, in which event, Broadway shall have no further obligations to cause the Property to be marketed for sale. Madison [Hudson] and Broadway agree that (i) notwithstanding the provisions of Paragraph 2 hereof and the provisions of the [October 20 letter agreement], neither Madison [Hudson], any principal or affiliate of Madison [Hudson] nor any other person acting on behalf of Madison [Hudson] (collectively, the 'Madison Parties') shall have any obligations with respect to any costs incurred by [Hudson], including, without limitation, costs relating to the lease or the ownership of the Property, provided, however, notwithstanding the foregoing provisions of this clause, neither Broadway, nor any principal or affiliate of Broadway or any person acting on behalf of Broadway shall be obligated for any

costs or expenses which were incurred by Madison [Hudson] and/or any of the Madison Parties on behalf of [Hudson] or otherwise relating to, or affecting the Property, prior to or after the date hereof, if such costs or expenses were incurred without the knowledge or consent of Broadway and (ii) Madison [Hudson] shall continue to own a fifteen (15%) percent interest in [Hudson]."

In relevant part, paragraph 6 provided that "all distributions made by [Hudson] shall be paid to Broadway and Madison [Hudson] in reduction of their respective aggregate capital contributions on a *pari passu* basis, based on the relative amounts of their respective aggregate capital contributions to [Hudson]." After distributions equaling the amount of all capital contributions had been made, paragraph 6 further provided that "all subsequent distributions shall be made Eight-five (85%) percent to Broadway and Fifteen (15%) percent to Madison [Hudson]."

The transaction, however, did not take place, either before or after November 22, 2000. In late December of 2000 or early January of 2001, the Neumann defendants began discussing with the Achenbaum defendants a sale of Hudson's leasehold interest in the property. The Neumann defendants also engaged a real estate broker, Grubb & Ellis, to market the property. Eventually, the Neumann defendants entered into a contract, dated April 17, 2002, to sell the leasehold to the Achenbaum defendants for $2.77 million. Thereafter, the contract closed, with the leasehold interest being owned by a company known as Hotel Gansevoort Group LLC (HG Group), a company comprised of one entity affiliated with the Achenbaum defendants and another entity unrelated to the Neumann defendants.

Meanwhile, in August of 2001, Madison Hudson and Madison Equities (collectively, Madison) brought this action. As amended in June of 2002, Madison's complaint alleges that: the Neumann defendants had no authority to sell Hudson's leasehold interest (first cause of action); the Neumann defendants breached an oral joint venture agreement between the parties, an agreement that allegedly gave Madison Equities the exclusive right to serve as the developer of the hotel and precluded the dilution of Madison Hudson's ownership interest in the property without its consent (second cause of action); the Neumann defendants breached their fiduciary duties to Madison Hudson (third cause of action); Madison was entitled to specific performance of the joint venture agreement and injunctive relief (fourth cause of action); Madison Hudson was entitled to an accounting and the imposition of a constructive trust (fifth cause of action); the

Achenbaum defendants tortiously interfered with the joint venture agreement (sixth cause of action); the Neumann defendants breached the November 13 letter agreement by failing to cause Hudson to distribute to Madison Hudson its $1 million capital contribution (seventh cause of action); all the defendants had been unjustly enriched (eighth cause of action); the sale of Hudson's leasehold interest was a fraudulent conveyance (ninth cause of action); and the Neumann defendants had breached the fiduciary duties they owed to Hudson (tenth cause of action).

Thereafter, but prior to the taking of depositions, the Neumann defendants and the Achenbaum defendants separately moved for summary judgment dismissing the amended complaint; Madison cross-moved for partial summary judgment on the seventh cause of action alleging that in violation of the November 13 letter agreement the Neumann defendants failed to cause Hudson to distribute to Madison Hudson its $1 million capital contribution. The IAS court denied defendants' motions for summary judgment, concluding that each motion was premature in that discovery was warranted on crucial issues. With respect to the cross motion, the court noted that the Neumann defendants did not challenge Madison Hudson's entitlement to the return of its $1 million capital contribution but only claimed that they were entitled to retain the contribution as security against any judgment the Neumann defendants might obtain on one of the counterclaims they had brought against Madison Hudson, Madison Equities and Robert Gladstone, a principal of Madison Hudson. Concluding that the Neumann defendants had no legal basis to retain the capital contribution, the court granted Madison's motion for partial summary judgment on the seventh cause of action in the amount of $1 million, plus interest, severed that cause of action and directed that judgment be entered accordingly. The Neumann defendants and the Achenbaum defendants appealed the denial of their motions for summary judgment, and this Court affirmed (4 AD3d 257 [2004]).

Following extensive discovery, the Neumann defendants and the Achenbaum defendants again made separate motions for summary judgment. As indicated above, the IAS court granted the Achenbaum defendants' motion and dismissed the complaint as against them. It also granted the Neumann defendants' motion to the extent of dismissing all the remaining causes of action, except certain claims for an accounting set forth in the fifth cause of action and certain unjust enrichment claims set forth in the eighth cause of action.

With respect to the Neumann defendants, Madison makes two principal arguments on this appeal. First, Madison argues that the IAS court erroneously disregarded issues of fact bearing on the question of whether the Neumann defendants engaged in "bona fide" marketing efforts. According to Madison, the Neumann defendants did not engage in "bona fide" efforts to market the lease because: (i) Grubb & Ellis was instructed by the Neumann defendants to market both the leasehold and the fee interest, the latter of which Hudson did not own, at an excessive price that "remained rigidly fixed at $20 million"; (ii) the Neumann defendants withheld basic and critical information about the lease from Grubb & Ellis; (iii) the Neumann defendants offered the leasehold interest, as opposed to the leasehold and the fee interest, to only one party, the Achenbaum defendants, and thus "never tested in the marketplace" the price offered by the Achenbaum defendants for the leasehold and "effectively made it impossible for anyone to outbid the Achenbaum defendants"; and (iv) the Neumann defendants did not begin to market the leasehold interest within the time period required by the November 13 letter agreement, and then precipitously directed Grubb & Ellis to cease all marketing efforts as soon as the Achenbaum defendants "purportedly agreed to purchase the Leasehold interest," a full year before they in fact purchased the leasehold.

This argument is premised at least in part on the contention that the second sentence of paragraph 4 of the November 13 letter agreement imposed an unqualified obligation on the Neumann defendants "prior to February 22, 2001, to cause the Property to be marketed for sale in a bona fide arms-length transaction to any unrelated third-party." Indeed, in advancing this argument, Madison repeatedly refers to failures of the Neumann defendants to comply with such a marketing obligation under the November 13 letter agreement.[1] However, throughout its brief, Madison ignores the first sentence of paragraph 4, which granted to the Neumann defendants the

---

1. In its seventh cause of action, the only cause of action asserting a breach of the November 13 letter agreement, Madison alleged only that the Neumann respondents failed to comply with their obligation to cause Hudson to distribute to Madison Hudson its $1 million capital contribution. Of course, the failure to plead a claim does not necessarily preclude its assertion in opposition to a motion for summary judgment (*see Alvord & Swift v Muller Constr. Co.*, 46 NY2d 276, 280-281 [1978]). In this case, however, Madison has already been awarded judgment on its seventh cause of action and that cause of action was severed. Whether Madison could amend its complaint to assert the claimed violations of marketing obligations under the November 13 letter agreement is an issue that is not before us and we need not address, as we conclude that the Neumann defendants did not have an unqualified obligation under the

right to market and sell the property to "any third-party" but did not itself obligate the Neumann defendants to market or sell the property.

We conclude that the November 13 letter agreement did not impose on the Neumann defendants an unqualified obligation to market and sell the property, let alone an absolute obligation to market and sell the property by a particular date "in a bona fide arms-length transaction to an[ ] unrelated third-party." The crucial principle of law in this regard is that contracts must be read as a whole and all terms of a contract must be harmonized whenever reasonably possible (*Matter of Westmoreland Coal Co. v Entech, Inc.*, 100 NY2d 352, 358 [2003]).

The first sentence of paragraph 4 unequivocally provides that in the event the transaction did not close by November 22, 2000, the Neumann defendants were to have the right to market and sell the property to any third party but were under no obligation to do so. At first blush, the second sentence of paragraph 4 appears both to curtail that right significantly and to impose an unqualified obligation to market and sell the property in a particular manner. In the event of the same contingency, after all, the second sentence specifies that the Neumann defendants, "[n]otwithstanding" the first sentence, "*shall* undertake, prior to February 22, 2001, to cause the Property to be marketed for sale in a bona fide arms-length transaction to any unrelated third-party" (emphasis added). The third sentence, however, defines the consequences for the Neumann defendants if they did not undertake to do what the second sentence states they "shall" undertake to do: they promptly must cause Hudson to distribute to Madison Hudson the outstanding amount of the latter's capital contributions. The fourth sentence makes clear that the marketing obligation of the second sentence is one that the Neumann defendants have the "right" to terminate "at any time" by causing Madison Hudson to receive its capital contributions. In conferring that broad right, the fourth sentence also makes clear that if the Neumann defendants did not undertake to market and sell the property in accordance with the second sentence, their sole liability would be to cause Hudson to distribute to Madison Hudson its capital contributions to Hudson.[2]

Thus, the first sentence of paragraph 4 granted the Neumann

November 13 letter agreement to market and sell the property by a particular date "in a bona fide arms-length transaction to any unrelated third-party."

**2.** By contrast, if the Neumann defendants did market and sell the property in accordance with the second sentence to an "unrelated third-party," the Neumann defendants would not have been required by the third sentence

*(n. cont'd)*

defendants a broad right to market and sell the property "to any third-party" but did not obligate them to do so. That broad right and freedom not to market and sell the property were qualified only by the other provisions of paragraph 4 that required the Neumann defendants *either* to market and sell the property prior to February 22, 2001, "in a bona fide arms-length transaction to any unrelated third-party" *or* to pay in effect an agreed-upon price, i.e., cause the accelerated return of Madison Hudson's capital contributions. To the limited extent the Neumann defendants were obligated to market and sell the property, a breach of that obligation would support nothing more than a claim by Madison Hudson for the return of its capital contributions. In short, the IAS court correctly ruled that the only damages Madison could recover for a breach of this obligation was the return of Madison Hudson's capital contributions. Madison's reliance on *Terminal Cent. v Modell & Co.* (212 AD2d 213 [1995]) is misplaced precisely because this limitation on the Neumann defendants' liability is "clearly, explicitly and unambiguously expressed in [the] contract" (*id.* at 218).[3]

Madison's second argument with respect to the Neumann defendants is that the IAS court erroneously concluded that the mere entry into the November 13 letter agreement by the

---

promptly so to cause Hudson to return to Madison Hudson its capital contributions. Rather, the provisions of paragraph 6 would have controlled and the capital contributions of Madison Hudson and the Neumann defendants would have been paid on a pari passu basis. If the sale proceeds, net of transaction expenses, were less than the aggregate of all capital contributions, the parties would have shared proportionately in the loss. But if the Neumann defendants sold the property to a party other than an "unrelated third-party" and the net sale proceeds were less than the aggregate of all capital contributions, the parties might have shared disproportionately in the loss. After all, such a sale would have triggered the obligation of the Neumann defendants under the third sentence to cause Hudson to distribute to Madison Hudson its capital contributions. On this reading of the November 13 letter agreement, it provided the Neumann defendants with an incentive rather than an obligation to market and sell the property "in a bona fide arms-length transaction to any unrelated third-party."

3. A related argument of Madison's is of no legal moment for the same reason. That is, Madison contends that the November 13 letter agreement required the Neumann defendants to sell to "any unrelated third-party" and that the IAS court erroneously ignored evidence tending to show that the Achenbaum defendants are not "unrelated" third parties. Even assuming, however, that the Achenbaum defendants are not "unrelated" (the agreement does not define the term) third parties, the agreement does not require the sale of the property to an "unrelated" party. Rather, the agreement permits the property to be sold to "any third-party" and simply specifies that the Neumann defendants promptly must cause the return of Madison Hudson's capital contributions if the purchaser is not "unrelated."

Neumann defendants was sufficient to terminate both the joint venture between the parties and the fiduciary duties the Neumann defendants owed to Madison pursuant to the joint venture. The IAS court, however, concluded somewhat more narrowly that the joint venture ended when the Neumann defendants "exercised [their] option to market and sell the Lease pursuant to the November 13 Agreement" and that their fiduciary duties "necessarily ceased with the termination of the joint venture by the Neumann [defendants'] withdrawal therefrom."

In any event, the scope of this argument by Madison is unclear. In its amended complaint, Madison claims that in selling the property the Neumann defendants wrongfully deprived Madison Equities of its alleged right under the joint venture agreement to earn developer's fees and wrongfully deprived Madison Hudson of its alleged right under the joint venture agreement not to have its ownership interest in the property diluted without its consent. To the extent Madison is renewing this claim, we reject it for the same reason the IAS court rejected it: it is without any support in the record. To the contrary, as a matter of law the Neumann defendants had the right to sell the property pursuant to the first and second sentences of paragraph 4 of the November 13 letter agreement when the acquisition of the Neumann defendants' interest in the property by Madison and TSP did not close by November 22, 2000. As the IAS court correctly determined, once the property was sold Madison Hudson could not continue to have an interest in it, let alone one that was not subject to dilution, and Madison Equities' role as a developer necessarily would cease. Indeed, Robert Gladstone, Madison Hudson's principal, acknowledged both of these realities during his deposition, as is clear from the excerpts of his testimony quoted by the IAS court in its written decision.

Madison is persuasive, however, to the extent it contends that the Neumann defendants owed fiduciary duties to Madison Hudson until the property actually was sold. The Neumann defendants do not dispute either that they had been in a joint venture with Madison Hudson or that for this reason they owed fiduciary duties to Madison Hudson. Rather, the Neumann defendants assert that in entering into the November 13 letter agreement, the parties "were replacing their prior joint venture relationship with a contractual winding-up arrangement." Even if they do not contend that the joint venture was terminated upon execution of the November 13 letter agreement, the Neumann defendants maintain that it was terminated once they acquired the right to market and sell the property when

the transaction, the contemplated acquisition of their interest in the property by Madison Hudson and TSP, did not close by November 22, 2000. According to the Neumann defendants, "since the joint venture had no further purpose at that point it was terminated."

The termination of the joint venture, however, was simply one possible consequence of the November 13 letter agreement. The execution of the agreement did not guarantee either that the transaction would occur or that, if it did not, the Neumann defendants would elect to pursue their right to market and sell the property. If the transaction did not take place, another possible outcome was that the parties would remain joint venturers, either because the Neumann defendants elected not to pursue their right to market and sell the property or a purchaser willing to pay an acceptable price could not be found. To be sure, the Neumann defendants did exercise their option to market the property. But that effort, of course, was not bound to succeed. Accordingly, the joint venture did not become "pointless" or impossible to accomplish merely because the Neumann defendants undertook to market the property.

The controlling issue of law, moreover, is whether the Neumann defendants ceased being fiduciaries of Madison Hudson before the interests in the property of both parties were extinguished with the closing of the sale to the Achenbaum defendants. The answer is that the Neumann defendants were "fiduciaries . . . until the moment the buy-out transaction closed" (*Blue Chip Emerald v Allied Partners*, 299 AD2d 278, 279 [2002]). As Madison correctly argues, the Neumann defendants' position entails the proposition that they could have sold the property for any price without breaching any fiduciary duty to Madison. That proposition cannot be reconciled with the 15% ownership interest in the property that, as the final clause of paragraph 4 of the November 13 letter agreement takes care to state, Madison Hudson continued to have.[4]

---

4. Although the Neumann defendants urge that "in a worst case scenario from [Madison Hudson's] perspective, the only thing [it] had a right to receive" under the November 13 letter agreement was a return of its capital contributions, whether they contend that the execution of that agreement extinguished Madison Hudson's minority ownership interest is not clear. To the extent they do, and even putting aside the final clause of paragraph 4, that contention is meritless. It makes no sense to conclude that Madison Hudson agreed to make an additional capital contribution of $500,000, granted rights to the Neumann defendants to sell the property and surrendered its 15% ownership interest, all in exchange for a qualified right to have the Neumann defendants cause Hudson to return its $1 million capital contribution (*see Metropolitan Life Ins. Co. v Noble Lowndes Intl.*, 84 NY2d 430, 438

Nonetheless, no triable issue of fact exists with respect to Madison's cause of action against the Neumann defendants for breach of fiduciary duty in the sale of the property to the Achenbaum defendants. In particular, Madison's expert never opined in his affidavit that the property was sold at a below-market price. Nor did the affidavit otherwise set forth facts sufficient to raise a triable issue of fact as to whether the property was sold at a below-market price. Because the property was not sold to the Achenbaum defendants as a result of the efforts to market the property through Grubb & Ellis, the expert's criticisms of those efforts are beside the point. In the absence of any factual showing of injury, i.e., that the price paid by the Achenbaum defendants was a below-market price, Madison's breach of fiduciary duty claim was properly dismissed (*see generally Kurtzman v Bergstol*, 40 AD3d 588 [2007]).

For the same reason, we reject Madison's argument in support of the unpleaded claim that the Achenbaum defendants aided and abetted the alleged breach of fiduciary duty by the Neumann defendants. Madison's other arguments with respect to the Achenbaum defendants are unavailing. As Madison failed to show any breach of the November 13 letter agreement in the sale of the property to the Achenbaum defendants, the unpleaded claim that the Achenbaum defendants tortiously interfered with that agreement was properly rejected (*see Goldfeld v Mattoon Communications Corp.*, 99 AD2d 711 [1984], *appeal dismissed* 62 NY2d 802 [1984]). Although Madison's sixth cause of action alleges that the Achenbaum defendants tortiously interfered with the joint venture agreement, Madison offers virtually no argument in its briefs in support of this cause of action and does not cite any provision of the joint venture agreement that was breached. Accordingly, we deem Madison to have abandoned any claim of error in the dismissal of this cause of action (*see Farley v Town of Hamburg*, 34 AD3d 1294 [2006]).

Thus, we modify only to the extent of permitting Madison Hudson to seek recovery under the portion of the fifth cause of action for an accounting of its 15% share of any profits from the sale of the property. Concur—Sullivan, J.P., Nardelli, Williams, Sweeny and McGuire, JJ.

---

[1994] ["It is highly unlikely that two sophisticated business entities, each represented by counsel, would have agreed to such a harshly uneven allocation of economic power under the Agreement"]). Moreover, in a submission in support of the Neumann defendants' motion for summary judgment, defendant Weldler stated that the Neumann defendants were holding in escrow not only Madison Hudson's capital contribution of $1 million but its "15% interest in the profit," estimated to be some $350,000, from the sale of the property.