(November 18, 2010)

■ ALEXANDER M. FRAME, Respondent, v KENNETH L. MAYNARD et al., Appellants-Respondents. R.H. GUTHRIE et al., Cross Claimants/Respondents-Appellants, v KENNETH L. MAYNARD et al., Appellants-Respondents. [911 NYS2d 314]—

Judgment, Supreme Court, New York County (Paul G. Feinman, J.), entered October 27, 2008, after a bench trial, inter alia, awarding the principal amounts of $421,220.80 to plaintiff, $325,598.54 to cross-claimant Beatrice Guthrie and $162,799.27 to cross-claimant Paulson, and dismissing the cross claims of cross-claimant Hines, unanimously modified, on the law and the facts, the amounts awarded to Guthrie and Paulson vacated, Hines's cross claims for breach of fiduciary duty and constructive fraud reinstated, and the matter remanded for further proceedings as to damages in accordance with the opinion herein, and otherwise affirmed, without costs. Appeals from order, same court and Justice, entered on or about October 7, 2008, unanimously dismissed, without costs, as subsumed in the appeal from the judgment, and appeals from orders, same court and Justice, entered February 5, 2009 and April 24, 2009, unanimously dismissed, without costs, as academic.

Plaintiff Frame and defendant Maynard were the two general partners of a limited partnership (the partnership), formed in 1980, to acquire and operate a building at 5008 Broadway, and they acquired the underlying land as tenants in common. The eight limited partnership shares were acquired by Maynard, Guthrie, Paulson, Hines and others. Under the limited partnership agreement (the agreement), the net proceeds of a sale or refinancing of the "Project," defined as the building, were to be split 60-40 between the limited partners and the general partners. Following a settlement agreement entered into in 1986, Frame conveyed his half-interest in the underlying land to the partnership and resigned as general partner. The agreement was amended to provide that Frame would receive 20% of the net proceeds of a sale or refinancing of the "real property in the Project," with the remainder to be split 25% to the general partner and 75% to the limited partners.

In May 2001, Maynard offered to acquire the limited partners' interest in the partnership property for $842,427. Maynard provided schedules to the limited partners representing that the value of the building, based on its cash flow as shown in historical profit and loss statements, was $665,074 or $842,427, depending on the capitalization rate used. A majority of the limited partners consented to Maynard's proposed acquisition of the property, i.e., the building and the 50% ownership interest in the land owned by the partnership, on his own behalf or for a wholly owned entity.

However, Maynard did not disclose to the limited partners

that, since March 2001, he had been negotiating with the Community Preservation Corporation (CPC) to obtain a mortgage loan on the property at 5008 Broadway from the Federal Home Loan Mortgage Corporation (Freddie Mac) in the proposed amount of $1,550,000. During those negotiations, Maynard provided CPC with "adjusted" historical profit and loss numbers, which supported the proposed loan amount. An appraisal prepared by an independent appraiser in connection with Maynard's loan application valued the building and land in the range of $2.2 million as of June 2001. In November 2001, Maynard sent checks in the amount of about $40,000 per share to the limited partners purportedly representing their share of the sale of the partnership property.

On February 7, 2002, Maynard assigned his right to acquire the partnership property to defendant 5008 Broadway Associates, LLC (5008 LLC) for nominal consideration, and a deed conveying the property to 5008 LLC was filed. On the same date, 5008 LLC received a mortgage loan from CPC in the amount of $1,485,000, leaving net proceeds of about $1 million. In late February, Maynard made an additional distribution to the limited partners of about $5,000 per share, purportedly representing final distribution of the partnership's assets.

At trial, Maynard testified that he never disclosed any facts concerning his negotiations with CPC for the proposed $1.5 million loan to the limited partners because he "simply didn't see any connection." He denied knowing that any appraisal had been prepared in connection with his mortgage application, and insisted that the representations he made to the limited partners concerning value were true, while CPC and Freddie Mac were overvaluing the property. Regarding Frame's interest under the agreement, Maynard testified that he did not distribute any amounts to Frame because, after deducting the value of the half-interest in the land, there were no sales proceeds to distribute to him.

It is well established that the decision of the fact-finding court should not be disturbed unless it is obvious that the court's conclusions could not be reached under any fair interpretation of the evidence (*Thoreson v Penthouse Intl.*, 80 NY2d 490, 495 [1992]). Here, we defer to the trial court's findings that Maynard was not a credible witness, and that the limited partners, the loan mortgage officer from CPC and the appraiser who appraised the property generally were credible. We note as well that Maynard's testimony was at odds with common sense in important respects and was undermined by documentary evidence, including contemporaneous documents tending to estab-

lish what can scarcely be doubted in any event, i.e., that Maynard well knew of the appraisal.

The record amply supports the trial court's conclusion that Maynard breached his fiduciary duty. As a general partner, Maynard owed a fiduciary duty to the limited partners that continued "until the moment the buy-out transaction closed" (*Blue Chip Emerald v Allied Partners*, 299 AD2d 278, 279 [2002]; *see Madison Hudson Assoc. LLC v Neumann*, 44 AD3d 473, 483 [2007]). That duty imposes a stringent standard of conduct that requires a fiduciary to act with " 'undivided and undiluted loyalty' " (*Blue Chip Emerald*, 299 AD2d at 279, quoting *Birnbaum v Birnbaum*, 73 NY2d 461, 466 [1989], citing *Meinhard v Salmon*, 249 NY 458, 463-464 [1928]). "Consistent with this stringent standard of conduct, . . . when a fiduciary . . . deals with the beneficiary of the duty in a matter relating to the fiduciary relationship, the fiduciary is strictly obligated to make 'full disclosure' of all material facts," meaning those " 'that could reasonably bear on [the beneficiary's] consideration of [the fiduciary's] offer' " (*id.*, quoting *Dubbs v Stribling & Assoc.*, 96 NY2d 337, 341 [2001]). It is beyond dispute that the facts relating to Maynard's negotiation of a mortgage loan of about $1.5 million, which required that the property be valued at over $2 million, had a bearing on the limited partners' consideration of Maynard's offer to acquire the property based on a valuation of $842,427 (*see Littman v Magee*, 54 AD3d 14, 17-18 [2008]; *Blue Chip Emerald*, 299 AD2d at 280). Since the consents were revocable and the partnership was not dissolved, Maynard had a continuing duty to inform the limited partners of material facts.

The trial court correctly found that Paulson and Guthrie, as beneficiaries of this fiduciary relationship, were entitled to rely on Maynard's "representations and his complete, undivided loyalty" (*TPL Assoc. v Helmsley-Spear, Inc.*, 146 AD2d 468, 471 [1989]), and were not required to perform "independent inquiries" in order to reasonably rely on their fiduciary's representations (*id.*; *see also Andersen v Weinroth*, 48 AD3d 121, 136 [2007]). Guthrie was entitled to rely on her husband's assessment of the offer letter, and Paulson could rely on Maynard's affirmative duty to disclose material information when she questioned him about the "amazingly low" price. Neither was aware of any information that rendered their reliance unreasonable, or would cause them to question Maynard's representations (*see Littman*, 54 AD3d at 17; *cf. Global Mins. & Metals Corp. v Holme*, 35 AD3d 93, 98-101 [2006], *lv denied* 8 NY3d 804 [2007]). Even if they had investigated further, there is no

basis for finding that they would have uncovered the concealed facts (*see Andersen*, 48 AD3d at 136).

For the same reasons, we conclude that Hines justifiably relied on Maynard's oral and written representations concerning the value of the partnership property. Hines lived in South Carolina and, as an investor in three limited partnerships managed by Maynard, had relied on him for 20 years. Although he had doubts about aspects of the offer letter and had questioned Maynard over the years about expenses, it was only in hindsight, after he learned that Maynard had created adjusted historical figures that supported a property valuation of over $2 million, that he realized that the offer letter was full of falsehoods. Under these circumstances, Hines's impressive educational and professional credentials do not warrant a finding that he did not justifiably rely on Maynard's material misrepresentations and omissions. Even if he had inquired further, there is no basis for finding that he could have discovered the concealed information, since Maynard testified he saw no reason to disclose it and did not know of the appraisal himself.

Regarding Frame's claim that Maynard breached the agreement, we agree with the trial court's finding that Maynard's interpretation of the agreement to exclude Frame from any distribution of net proceeds resulting from a sale of the partnership's property is neither credible nor comprehensible. To accept Maynard's argument would render meaningless the provision requiring distribution of the first 20% of proceeds of a sale or refinancing of the "Project" to Frame, and also would require interpreting the same term differently within the same section of the contract. The court properly accorded the words of the contract their "fair and reasonable meaning" consistent with the parties' "reasonable expectations" (*Sutton v East Riv. Sav. Bank*, 55 NY2d 550, 555 [1982] [internal quotation marks and citations omitted]).

In considering the damages award, we note that the trial court's award apparently disregards the value of Maynard's half-interest in the land. We need not address the issue, as Maynard, the party adversely affected, does not raise any claim of error on this account. The general rule is that the measure of damages when a fiduciary has sold property for an inadequate price is the difference between what was received and what should have been received, so that the beneficiary of the fiduciary duty is placed in the same position he or she would have been in absent the breach (3 Scott, Trusts § 208.3, at 1687 [3d ed 1967]). *Matter of Rothko* (43 NY2d 305 [1977]), however, established an exception to this general rule. In that case, the

trustees of the artist Mark Rothko's estate engaged in self-dealing. Specifically, they sold paintings to galleries with which they were affiliated and the galleries promptly resold the paintings for up to 10 times the amounts paid to the estate. The Surrogate awarded damages in the amount of the difference between the sale price and the value of the paintings at the time of the trial. The Court of Appeals upheld the award, holding that this increased measure of damages is appropriate "where the breach of trust consists of a serious conflict of interest—which is more than merely selling for too little" (*Rothko*, 43 NY2d at 321). The *Rothko* court specified that the "serious conflict of interest" was the self-dealing of the trustees who sought to profit from the low sales prices to the detriment of the estate. Subsequent cases have upheld the *Rothko* rule in both estate and other fiduciary situations, awarding appreciation damages when a fiduciary has engaged in self-dealing (*e.g. Matter of Witherill*, 37 AD3d 879, 881 [2007]; *Scalp & Blade v Advest, Inc.*, 309 AD2d 219, 232 [2003]).

This case cannot be distinguished from *Rothko*. In both cases, the trial court found a breach of fiduciary duty as well as both constructive and actual fraud resulting from self-dealing by the fiduciaries. The *Rothko* court described the conduct of the estate trustees as "manifestly wrongful and indeed shocking" (*Rothko*, 43 NY2d at 314). Maynard's conduct in the present case is no less improper, especially given that he repeatedly assured the limited partners that the price he was offering was generous while simultaneously negotiating for a mortgage that presupposed a far higher valuation for the partnership property.

However, the trial court's determination to exclude Maynard's limited partnership share from the calculation of the limited partners' damages was improper. While a faithless servant forfeits his right to compensation, Maynard did not acquire his interest as a result of fraud or breach of duty, and is not receiving any compensation on account of his share. Disregarding his share in calculating damages leads to an unwarranted windfall for the litigating limited partners, who are entitled only to their fair share of net proceeds received from the sale of partnership property at fair market value (*see Rothko*, 43 NY2d at 321-322). We have previously held that removal of Maynard as general partner is not an appropriate remedy in light of the dissolution of the partnership (*Frame v Maynard*, 39 AD3d 328 [2007]). Concur—Gonzalez, P.J., Saxe, McGuire, Manzanet-Daniels and Román, JJ.