■ GOOD HILL MASTER FUND L.P. et al., Respondents, v DEUTSCHE BANK AG, Appellant. [46 NYS3d 33]—

Judgment, Supreme Court, New York County (O. Peter Sherwood, J.), entered July 21, 2016, awarding plaintiffs, after a nonjury trial, the sum of $22,142,221.13, with prejudgment interest at the rate of 21% from August 18, 2009 through date of entry of judgment in the sum of $68,061,305.71, and awarding plaintiffs attorneys' fees and litigation expenses in the sum of $3,750,000, for a total sum of $93,953,526.84, and awarding plaintiffs postjudgment interest at the statutory rate on the counsel fees and litigation expenses, and at the rate of 21% on the remainder of the judgment ($90,203,526.84) until the date payment of the judgment is complete, and bringing up for review an order, same court and Justice, entered November 27, 2015, which, among other things, precluded, in limine, one of defendant's experts from testifying, and orders, same court and Justice, entered February 3, 2016, and, as amended, March 30, 2016, unanimously affirmed, with costs. Appeals from the foregoing orders, unanimously dismissed, without costs, as subsumed in the appeal from the judgment.

This action arises out of a dispute between defendant Deutsche Bank, AG and plaintiffs Good Hill Master Fund L.P. and Good Hill Master Fund, H.L.P. (collectively, Good Hill), two hedge funds. In October 2007, nonparty Bank of America Securities, LLC issued notes to fund a securitization backed by $10.3 billion worth of residential mortgage-backed securities; the notes relevant to this action were classified in tranches designated A1 through B13. That same month, Good Hill bought, at par, all of the notes designated B6 through B12 for a total of approximately $54 million. Only the B6 notes were investment grade. No other entity invested in the securitization, and Bank of America retained the rest of the notes.

In early 2008, Good Hill and Deutsche Bank executed credit default swap agreements that referred to the B6 notes. In those agreements, Deutsche Bank bought protection again one of three risks: a writedown or forgiveness of the principal, a failure to pay principal, and an interest shortfall. If any of these three events occurred, Good Hill would be obliged to pay Deutsche Bank. The relevant swap agreements included, among other things, a 2002 International Swaps and Derivatives Association, Inc. (ISDA) Master Agreement (ISDA Master Agreement) and 2003 ISDA Credit Derivatives Definitions.

Under the terms of the swap agreements, Deutsche Bank paid Good Hill $12.8 million up front and $1.5 million in total monthly payments. In exchange, "[i]f a Floating Amount Event occurs, then . . . Seller [Good Hill] will pay the relevant Floating Amount to Buyer [Deutsche Bank]." A "floating amount

event" included a "writedown" of the B6 notes, defined as "the forgiveness of any amount of principal by the holders of the [B6 Notes] pursuant to an amendment to the Underlying Instruments [the Indenture underlying the securitization] resulting in a reduction in the Outstanding Principal Amount." Because Good Hill might have been required to pay the floating amount if certain events occurred, it posted collateral up front. If the market value of the B6 notes fell, Deutsche Bank could demand more collateral, and if it rose, Good Hill could demand the return of some collateral.

Further, section 9.1 (b) (iii) of the 2003 ISDA Credit Derivatives Definitions provided, in relevant part, that the parties "may act with respect to such business in the same manner as each of them would if such Credit Derivative Transaction did not exist, regardless of whether any such action might have an adverse effect on . . . the position of the other party to such Credit Derivative Transaction or otherwise."

By April 2009, the market had declined dramatically, and the B6-B12 notes were downgraded to well below investment grade. In an effort to mitigate its own risks in the declining market, Bank of America decided to unwind and terminate the securitization. It thus offered to buy back Good Hill's notes, because they were the only tranches that Bank of America did not own. Bank of America rejected Good Hill's initial asking price of $.70 on the dollar; the parties ultimately negotiated a price of $.29 on the dollar for the entire "stack" of B6 through B12 notes.

In July 2009, before finalization of the repurchase of the notes, Good Hill tried to persuade Bank of America to treat the cancellation as a redemption, which would not have constituted a floating amount event, and would not have triggered any obligation to pay Deutsche Bank under the swap agreements. Bank of America, however, refused to treat the cancellation of the notes as a redemption.

Good Hill then asked Bank of America to allocate the total purchase price for the stack of B6 through B12 notes so that the B6 notes would be paid at 100% of par, and the remaining tranches little to nothing. This action would result in no floating amount due to Deutsche Bank, as the principal forgiven would be zero. After further negotiation, Good Hill and Bank of America ultimately agreed to an 83% allocation to the B6 notes, meaning that only 17% of the principal of the B6 notes would be forgiven.

Good Hill and Bank of America completed the repurchase on August 14, 2009. On August 17, 2009, Bank of America

cancelled the B6 through B12 notes along with terminating the securitization, and forgave total principal of 71% of the notes based on the 29% tender price.

On August 24, 2009, Deutsche Bank advised Good Hill that a floating amount event—namely, a writedown—had occurred. Under the swap agreements, Deutsche Bank was required to calculate the floating amount based solely on the basis of reports prepared by the entity that serviced the loans. However, Deutsche Bank stated that it could not rely on the servicer report because the principal paid on the B6 notes was "allocated in a manner that appears to be potentially arbitrary and inconsistent with our understanding of the market valuation of the certificates prior to such allocation."

On September 14, 2009, Good Hill sent Deutsche Bank two "Collateral Return Amount Demand" notices in which it calculated that Good Hill owed Deutsche Bank a payment of approximately $5 million. Therefore, Good Hill stated, it was entitled to return of approximately $22 million in excess collateral it had posted.

Ultimately, in a letter dated December 4, 2009, Deutsche Bank disputed Good Hill's reliance on a certain servicer report, stating that there was "no legitimate basis" for the allocation, and that it was "contrary to the market valuation" of B-6 through B-12 notes. Further, Deutsche Bank stated that it had "serious concerns that the arbitrary allocation was designed to minimize the Floating Amount payments due from Good Hill," and therefore, that it would not return Good Hill's collateral unless it received information demonstrating the propriety of the allocation methodology.

Good Hill then commenced this action, alleging two counts of breach of contract—one for each hedge fund—based on Deutsche Bank's failure to return the collateral. Deutsche Bank asserted defenses and counterclaims, alleging that Good Hill breached its obligations under the swap agreements to act in good faith and in a commercially reasonable manner, and that as a result, Deutsche Bank had no obligation to return the collateral.

At trial, Deutsche Bank sought to introduce testimony from Kimberly Summe, who was the General Counsel of the ISDA from September 10, 2001 to December 31, 2007. Summe was the author of the 2002 ISDA Master Agreement and 2003 ISDA Credit Derivatives Definitions, including section 9.1 (b) (iii), and a purported expert in understanding the ISDA marketplace with respect to section 9.1 (b) (iii). Deutsche Bank represented that Summe would testify that section 9.1 (b) (iii) allowed the

parties to transact in the B6 notes, but does not alter the obligation to act in good faith and in a commercially reasonable manner; nor did the section offer a "safe haven" for a party's transactions involving the B6 notes merely because the party engaged in a credit default swap.

Good Hill moved to preclude Summe's testimony, and in an order entered November 27, 2015, the court granted the motion because contract interpretation is "a task reserved to the court and is well within the ken of judges."

In a decision after trial, entered February 3, 2016, the trial court concluded that Good Hill had acted in good faith and in a commercially reasonable manner, and that Deutsche Bank had breached the swap agreements by, among other things, refusing to return Good Hill's collateral under those agreements. The court also reasoned that section 9.1[b] [iii] of the swap agreements expressly permitted Good Hill to act as it did— that is, "to trade in the [B6 notes] without regard to the existence of the swap or any adverse effect it might have on Deutsche Bank's position in the swap."

We find no basis to disturb the court's determination that Deutsche Bank breached the credit default swap agreements at issue here (*Frame v Maynard*, 83 AD3d 599, 601-602 [1st Dept 2011]; *see also Thoreson v Penthouse Intl.*, 80 NY2d 490, 495 [1992]). As the trial court found in awarding judgment in Good Hill's favor, Good Hill negotiated at arm's length with Bank of America to sell six tranches of notes the Bank had previously sold Good Hill at $.29 on the dollar, so that the Bank of America could unwind and terminate a securitization in the then-declining mortgage market. Bank of America's resulting writedown of the B6 notes would trigger a negative credit event under the swap agreements. As a result, Good Hill negotiated with Bank of America to forgive only 17% of the principal amount, resulting in a smaller payout to Deutsche Bank under the swap agreements, as opposed to forgiving principal of 71% across the board on all the tranches of notes based on the $.29 purchase price. Bank of America was free to accept or reject that 83% allocation and had rejected several prior proposals from Good Hill that would have resulted in no payment or an even smaller payment to Deutsche Bank.

Thus, contrary to Deutsche Bank's contentions, in negotiating this allocation, however aggressively, Good Hill acted in good faith and in a commercially reasonable manner, and Deutsche Bank failed to meet its burden of proving that Good Hill breached implied covenants of good faith and fair dealing (*Dalton v Educational Testing Serv.*, 87 NY2d 384, 389 [1995];

*see Tractebel Energy Mktg., Inc. v AEP Power Mktg., Inc.*, 487 F3d 89, 98 [2d Cir 2007]).

Nor did section 9.1 (b) (iii) of the 2003 Credit Derivatives Definitions proscribe Good Hill's conduct. As noted above, that section states, in relevant part, that the parties "may act with respect to such business in the same manner as each of them would if such Credit Derivative Transaction did not exist, regardless of whether any such action might have an adverse effect on . . . the position of the other party to such Credit Derivative Transaction or otherwise." The trial court correctly reasoned that the provision permits Good Hill to transact business involving the B6 notes, and pursue its own interests, even if it might have an adverse effect on defendant. The court, in citing Good Hill's arm's length transaction with Bank of America, did not adopt such a liberal reading of the provision as to suggest that it would allow Good Hill to act in bad faith to evade its obligations under the swap agreements.

Likewise, the trial court properly granted Good Hill's motion to preclude certain expert testimony proffered by defendant on the interpretation of section 9.1 (b) (iii). While the section is confusing, its interpretation is not a matter beyond the ken of a typical fact-finder. Nor does it involve issues of such scientific or technical complexity that require an expert explanation to allow the court to understand it (*Hendricks v Baksh*, 46 AD3d 259 [1st Dept 2007]; *Ortiz v City of New York*, 39 AD3d 359, 360 [1st Dept 2007], *lv denied* 9 NY3d 803 [2007]). Moreover, while Deutsche Bank frames the issue as one of market customs and practice, the issue is, as the trial court noted, a matter of contract interpretation, and "expert witnesses should not be called to offer opinion as to the legal obligations of parties under a contract; that is an issue to be determined by the trial court" (*Colon v Rent-A-Center*, 276 AD2d 58, 61 [1st Dept 2000]; *see also Northeast Restoration Corp. v T.A. Ahern Contrs. Corp.*, 132 AD3d 552 [1st Dept 2015]).

Further, the court properly awarded prejudgment interest at 21% under sections 9 (h) (i) (I) and 14 of the ISDA 2002 Master Agreements. The relevant rate was contractually defined as equal to the cost of funds, as certified by the "relevant payee," plus 1% per annum (ISDA 2002 Master Agreement § 14). Good Hill certified that the cost of funds was 20%, the interest rate on loans from third-party investors.

The result does not change because the relevant payee was a special purpose vehicle formed by Good Hill solely for administrative purposes to segregate the funds and costs that investors incurred at the time of Deutsche Bank's breach. Indeed,

the chief financial officer of Good Hill Partners, LP submitted a certification in support of the 21% rate, and this certification is still meritorious despite the fact that Good Hill formed a special purpose vehicle.

Deutsche Bank's argument that Good Hill could have obtained a more favorable rate is unavailing, as section 14 of the 2002 ISDA Master Agreement states that the default rate shall be certified "without proof or evidence of any actual cost." While the resulting judgment is large relative to the original award, "this is no reason to depart from the legal principle that contracts must be enforced according to the language adopted by the parties" (*NML Capital v Republic of Argentina*, 17 NY3d 250, 267 [2011]).

Moreover, as the cost of funds may be certified by the relevant payee "without proof or evidence of any actual cost," there was no basis for discovery or further briefing. Concur— Renwick, J.P., Moskowitz, Kapnick, Kahn and Gesmer, JJ.