[849 NYS2d 210]

G. CHRIS ANDERSEN, on Behalf of ANDERSEN, WEINROTH & CO., L.P., Appellant-Respondent, and G. CHRIS ANDERSEN, on Behalf of Himself, et al., Respondents, v STEPHEN WEINROTH, Respondent-Appellant. STEPHEN WEINROTH, on Behalf of Himself and ANDERSEN, WEINROTH & CO., L.P., Third-Party Plaintiff-Appellant, v G. CHRIS ANDERSEN et al., Third-Party Defendants-Respondents.

First Department, December 27, 2007

**APPEARANCES OF COUNSEL**

*Cooley Godward Kronish LLP*, New York City (*Alan Levine* and *Shannon S. McKinnon* of counsel), and *Withers Bergman LLP*, New York City (*Chaya F. Weinberg-Brodt* and *Hollis Gonerka Bart* of counsel), for appellant-respondent/respondents/ respondents.

*Stanley N. Futterman*, New York City and *Golenbock Eiseman Assor Bell & Peskoe LLP*, New York City (*David J. Eiseman* and *Elizabeth A. Jaffe* of counsel), for respondent-appellant/ appellant.

**OPINION OF THE COURT**

Mazzarelli, J.P.

This action arises out of a dispute between G. Chris Andersen and Stephen Weinroth. They are the two equity partners of Andersen, Weinroth & Co., L.P. (AWLP), a Delaware partnership. James Rawlings, an additional plaintiff, was a nominal partner of AWLP. He had no ownership interest, but invested with Andersen and Weinroth in certain opportunities.

AWLP was created in January 1996, and Andersen and Weinroth each owned 49.5%. The remaining 1% was owned by a corporation named AW & Co. GP, Inc., which was the general partner and was owned equally by Andersen and Weinroth. AWLP moved into an office pursuant to a lease, which commenced on June 1, 1996. At that time, Andersen and Weinroth each had many years of experience in the world of finance, which included service in the top echelons of leading investment banks such as Drexel Burnham and Paine Webber.

A written partnership agreement governed AWLP. It required Andersen and Weinroth each to make an initial capital contribution of $99,000 to the partnership. Neither partner was required to make any additional capital contributions. By mutual agreement, Weinroth managed and controlled AWLP's finances. He also controlled AWLP's year-end preparation for taxes. Andersen had access to the firm's financial information; however, he had to request accounting information from either Weinroth or his assistant. He could not independently retrieve the firm's computerized records, as he did not have the necessary password.

Andersen asserts that the partners had an oral agreement that all capital contributions were to be made equally. He alleges that Weinroth's assistant would notify him when AWLP's checking account became low, and Weinroth or his assistant would request a capital contribution. In conformity with this arrangement, the partners made nine equal capital contributions in the four years following AWLP's formation. However, in 2000, 2001 and 2002, Andersen's capital contributions exceeded Weinroth's by $1,385,000. Andersen contends that he was unaware that Weinroth had stopped matching his contributions. In the fall of 2002, Andersen began to suspect a problem. He alleges that Weinroth misled him as to the true nature of the capital accounts. He further claims that Weinroth frustrated his efforts to investigate the capital accounts. For example, Weinroth allegedly made a false entry in AWLP's accounting journal which

adjusted the 2000 capital accounts to reflect additional contributions by Weinroth in the amount of $1.3 million. Andersen also claims that Weinroth faxed him a note in October 2002 informing Andersen that Weinroth had made a capital contribution of $53,000. In reliance on that information, Andersen states that he matched the contribution. Weinroth disputes these facts.

Shortly after AWLP was formed, Andersen and Weinroth, both of whom actively served as directors of various other corporations, agreed that any compensation they derived in connection with their outside board service belonged to the partnership. This agreement was never reduced to writing. Indeed, the only written reference to the agreement in the record appears in two cursory memoranda from Weinroth to Andersen and certain AWLP employees in 1999 and 2000. These describe a partnership "policy" that directors' fees and options grants are to be contributed to the partnership. The memoranda further confirm that the policy permitted the partners to contribute the economic value of any options at the time of realization. Andersen contends that the policy became effective in June 1996 while Weinroth maintains that the policy became effective in March 1996.

As is relevant here, one of the corporations for which Weinroth served as a director was Core Laboratories N.V. (Core Labs). Weinroth served on Core Labs' board from 1994 until May 2001. In or about December 1997, Core Labs made Weinroth the beneficiary of a supplemental executive retirement plan (SERP). This guaranteed Weinroth annual payments of $250,000 for at least 15 years starting at the age of 65. A recital paragraph in the document creating the SERP indicated that it was created with the intention of recognizing the value to Core Labs of "past and present" services of the company's employees and directors. According to Core Labs, the SERP had a present value at the time it was granted of $3.844 million, which exceeded the present value placed on the SERP by Andersen. Weinroth did not contribute the SERP payments to AWLP.

As compensation for his service on the board of Hovnanian Corporation, Weinroth was granted 7,500 Hovnanian stock options in November 2001. Pursuant to the vesting terms of that grant, 2,500 of the options were to vest in November 2002, and the remaining two thirds in November 2003 and November 2004, if Weinroth remained on the board.

Andersen served on the board of directors of Terex Corporation. Andersen received 15,000 Terex stock options in April

1996 and an additional 15,000 in April 1997. Andersen exercised all 15,000 of his 1997 options in April 2002. On December 31, 2003, he transferred 7,900 of the shares to AWLP so that it could pay off a liability. He claims that he retained the remaining 7,100 shares as reimbursement for the cost[1] of exercising all 15,000 options.

Beginning in 1998, Andersen and Weinroth jointly purchased bonds of Essar Steel, an Indian steel company. Rawlings invested in Essar in 1999. The investments were made by the three men individually, and not in their capacities as partners in AWLP. The three agreed that any proceeds from the investment would be shared pro rata. At the end of 1999, Weinroth instructed AWLP's accountant to convert the pooled investment in Essar into a partnership investment. The firm accountant found that $1.86 million had been invested in Essar, although Weinroth had led Andersen and Rawlings to believe that the total was $2.559 million. Weinroth told the accountant that the "missing" amount represented a margin call he had met by himself in the amount of $638,952, when Andersen was out of the office. Weinroth repeatedly represented to Andersen and Rawlings that he invested the $638,952 and he even prepared a written accounting of the Essar investment, which reflected his purported payment of the margin call. However, Weinroth has never documented the investment and AWLP's accountant stated to Andersen that Weinroth did not make the margin call. The proceeds from the Essar investment were distributed pro rata as if Weinroth had invested the additional $638,952.

In October 2001, Andersen paid Weinroth $300,000. Andersen contends that this was a personal loan, although there is no documentation establishing that assertion. Weinroth counters that he invested in a company called Headway Research, Inc., on behalf of himself and Andersen and that the investment resulted in a loss of $725,000. It is Weinroth's position that the $300,000 payment was a partial reimbursement of Andersen's share of the loss, and that $62,000 remains owing.

In December 2002, AWLP ceased active operations and in January 2003, Andersen and Weinroth formed a new entity called Andersen, Weinroth & Partners, LLC, which succeeded to AWLP's lease. In May 2003, the new entity gave way to a third entity, Andersen & Co. LLC, which did not include Weinroth,

---

**1.** The cost of exercising each option is the "strike" price, which is the amount the option holder must pay to acquire the stock.

and which further assumed the lease. Weinroth alleges that the demised premises had been improved by AWLP in the amount of $470,000, after appreciation. Upon his departure from Andersen, Weinroth & Partners, LLC, Weinroth distributed a memorandum to two of the partners in Andersen & Co. This stated that the space could be "[t]aken over by surviving entity if wanted," but was silent with regard to the leasehold improvements. When he finally vacated the space, Weinroth took some personal artwork, and nothing else.

Andersen, derivatively on behalf of AWLP and individually, and Rawlings commenced this action in July 2003. The complaint asserted eight causes of action. The first cause of action was for breach of the partnership agreement, and was based on Weinroth's alleged failure to contribute equal amounts of capital to AWLP. The second cause of action claimed a breach of oral agreements alleged to relate to the capital accounts, the Essar investment, the directors' compensation policy and Andersen's $300,000 loan to Weinroth. The complaint further asserted a third cause of action for breach of fiduciary duty, a fourth cause of action for fraud, a fifth cause of action for fraudulent concealment, a sixth cause of action for conversion and a seventh cause of action for unjust enrichment. The third cause of action related to the disparity in capital contributions and the Essar investment. The fourth through seventh causes of action all relied on those facts, as well as additional allegations regarding the directors' compensation policy. Finally, the eighth cause of action sought a full accounting of AWLP's assets, liabilities, profits and losses.

Weinroth, derivatively on behalf of AWLP and individually, asserted 11 counterclaims against Andersen, Rawlings, and the two entities which succeeded AWLP. Only the second and fifth through ninth counterclaims are at issue on this appeal. The second counterclaim sought damages for breach of contract related, in part, to the directors' compensation policy. The fifth counterclaim was for conversion against Andersen and the successor entities to AWLP.[2] It sought recoupment of Weinroth's share of the leasehold improvements. The sixth counterclaim was for unjust enrichment against Andersen and the successor entities, also in connection with the leasehold improvements. The seventh counterclaim was for unjust enrichment against Andersen only. It was premised on the allegation that Andersen

---

2. The claims against the successor entities were actually third-party claims, but were not denominated as such.

still owed Weinroth $62,000 for his share of the loss on the Headway Research investment. Finally, Weinroth's eighth and ninth counterclaims sought, respectively, a full accounting from Andersen and Rawlings of their directors' compensation, and from AWLP of its assets and liabilities.

After substantial discovery, Weinroth moved for partial summary judgment to dismiss that part of the third cause of action in the amended complaint as sought damages for breach of a fiduciary duty allegedly owed to Rawlings. He argued that as an employee of AWLP, Rawlings was not owed such a duty. Weinroth further sought dismissal of Andersen's and Rawlings's fourth and fifth causes of action for fraud and fraudulent concealment. Weinroth argued that Andersen and Rawlings did not rely on his alleged misrepresentations regarding the extent of his capital contributions, his investment in Essar or his directors' compensation, and that, even if they did so rely, the reliance was not justified. Finally, Weinroth's motion sought summary judgment on that part of his second counterclaim for breach of contract that alleged that Andersen failed to contribute directors' fees to the partnership. He asserted that he contributed all of the fees he received but that Andersen did not.

AWLP cross-moved for partial summary judgment on its claim for an accounting of all directors' compensation received by AWLP partners and employees. The cross motion requested a reference to a Special Referee to report and recommend as to each item of directors' compensation. Rawlings cross-moved for summary judgment dismissing the third and tenth counterclaims against him. These sought, respectively, damages for breach of contract and an accounting with respect to the directors' compensation policy.

The IAS court, in a July 5, 2005 order, granted the motion and cross motion to the limited extent of declaring that AWLP was entitled to an accounting of all directors' compensation received by its partners and employees. It also referred that matter to a Special Referee to hear and report (or determine upon stipulation of the parties) regarding (1) the effective time period of the directors' compensation policy; (2) whether the Core Labs SERP was covered by the policy; (3) the directors' compensation received by AWLP's partners and employees during the relevant period and the value thereof; and (4) the amounts owed by each of the parties to AWLP in connection with the policy. The court denied all other aspects of the motion and cross motion, finding issues of fact.

A hearing before a Special Referee was held over five days in September, October and November 2005. The parties presented evidence concerning when the directors' compensation policy became effective, the specific compensation that Andersen and Weinroth had earned that had not yet been contributed to AWLP, and whether the SERP was embraced by the compensation policy. Both parties presented expert testimony relating to the value of directors' compensation they had earned, but not yet contributed to AWLP. One of the seven witnesses at the hearing was Richard Bergmark, Core Labs' chief financial officer. He testified that the SERP was awarded retroactively to Weinroth and three other individuals. This he said was to reward them for work they performed in 1994 in connection with the buyout of Core Labs by its management, and in 1995 in relation to Core Labs' initial public offering. He further testified that the language in the SERP document expressing Core Labs' desire to reward Weinroth for his "past and present services" was boilerplate from a generic form that was never edited.

After hearing the evidence, the Special Referee issued a report which rejected Andersen's position that the Core Labs SERP fell within the scope of the directors' compensation policy. He found that Andersen's testimony and other evidence did not contradict the only two written memorializations of the policy, both of which referred to "fees" and "options".

In considering the extent of the directors' fees and options owed to the partnership, the Special Referee declared the compensation policy to be effective as of June 1, 1996, the date advanced by Andersen, and to have terminated on December 31, 2002, when AWLP ceased to actively function. The Special Referee then chose July 5, 2005 as the valuation date of the directors' compensation paid to Andersen and Weinroth as a result of their respective board service. This was the date of the IAS court's order determining that Andersen and Weinroth were both liable to AWLP for directors' compensation. However, he valued 7,100 of Andersen's Terex shares from the 1997 option grant as of December 31, 2003, when the other 7,900 shares from that grant were contributed to AWLP. Adopting the valuation methodology advocated by Andersen in a post-trial submission, the Special Referee concluded that Weinroth owed AWLP a total of $2,304,490. This sum represented fees, stock and stock options earned by him in connection with his service on corporate boards, including all of the Hovnanian options. The

Special Referee further concluded that Andersen owed AWLP a total of $1,087,388 in connection with his own board service.

The IAS court held a nonjury trial over seven days in January and February 2006. The parties presented testimony and documentary evidence related to Weinroth's handling of AWLP's capital accounts and the contributions that Andersen made to those accounts. They also submitted evidence regarding their roles in the Essar investment, the purpose of the $300,000 payment from Andersen to Weinroth, and Weinroth's intentions regarding the leasehold improvements when he vacated the office space that had been leased by AWLP.

Shortly after the close of trial, the parties moved and cross-moved to confirm in part, and reject in part, the Special Referee's report. In an order entered November 3, 2006, the court confirmed the majority of that report's findings. With respect to the Core Labs SERP, the court found that the Special Referee properly credited the testimony of Mr. Bergmark. It further found that the AWLP directors' compensation policy became effective on June 1, 1996. The court also agreed with the Special Referee's use of July 5, 2005, as the valuation date for directors' compensation granted to the former partners.

As to the issues raised at trial, the court found as follows. Regarding the Essar investment, the court upheld plaintiffs' causes of action for breach of oral contract, fraud, fraudulent concealment and breach of fiduciary duty. On all four of those causes of action, it awarded damages to Andersen and Rawlings representing what would have been the pro rata distribution on the Essar investments. The court dismissed the claims for conversion and unjust enrichment based on the Essar investment, holding that they were not based on facts independent of the breach of contract claim.

The court found that there were no enforceable oral agreements governing the capital accounts, and that Weinroth did not breach the partnership agreement. It also determined that Weinroth did not convert any of AWLP's capital because he never took possession of it. In examining the court's treatment of the other claims that relate to the capital accounts, it is helpful to divide them into two separate categories: one refers to the $1.3 million balance sheet disparity, and another is Weinroth's purported $53,000 capital contribution. As to the $1.3 million balance sheet disparity, the court dismissed the applicable portion of the fraud claim. It found that Andersen did not rely on any misrepresentation by Weinroth. However, the court upheld

Andersen's causes of action for fraudulent concealment, breach of fiduciary duty and unjust enrichment regarding the $1.3 million disparity. It based this finding on circumstantial evidence that Weinroth had caused the false entry to be made.

As to Weinroth's $53,000 capital contribution, the court found this to be a misrepresentation. Therefore, it found him liable for fraud, fraudulent concealment, breach of fiduciary duty and unjust enrichment.

The court credited Andersen's testimony that the $300,000 payment to Weinroth was a loan and rejected Weinroth's testimony that the payment was for the Headway investment loss. Accordingly, it upheld Andersen's claim that Weinroth breached an oral agreement to repay the loan.

The court also severed the eighth cause of action (and Weinroth's ninth counterclaim), both of which sought an accounting of AWLP's assets and liabilities. It referred the accounting claims to the same Special Referee to report and recommend.

The court dismissed Weinroth's fifth and sixth counterclaims, for, respectively, conversion and unjust enrichment. The court reasoned that Weinroth authorized the successor entities to enjoy the leasehold improvements without compensation to him. The court also dismissed the seventh counterclaim for unjust enrichment. It rejected Weinroth's testimony that Andersen had agreed to share equally in losses from the Headway Research investment. Finally, the court dismissed Weinroth's cross claim for an accounting of Andersen's directors' compensation, because the Special Referee had disposed of the issue.

On appeal, Andersen argues that Weinroth's SERP award should have been considered AWLP property. Weinroth counters that the Special Referee properly concluded that the SERP was not partnership property. Weinroth also challenges the July 5, 2005 date that the Special Referee chose for the valuation of directors' compensation to which AWLP was entitled from Weinroth and Andersen. Weinroth contends that the unvested portion of his Hovnanian options should not have been considered in determining sums that he owed AWLP. And, Weinroth challenges the Special Referee's failure to include the value of all of Andersen's 1996 Terex options and 7,100 of Andersen's 1997 Terex options in the amount Andersen owed AWLP. Weinroth argues that an accounting was a precondition to a finding that he was liable for fraud, fraudulent concealment, or breach of fiduciary duty. Weinroth also asserts that the elements of fraud and breach of fiduciary duty were not established against him.

He further argues that the fraud claim based on the Essar transaction is duplicative of the contract claim based on the same transaction. Finally, Weinroth claims that the evidence did not support the court's conclusions: (1) that Andersen loaned him $300,000; and (2) that Weinroth assented to Andersen & Co. LLC taking over the leasehold improvements.

In reply, Andersen reiterates his claim that the SERP should have been considered AWLP property. He defends the July 5, 2005 valuation date and the June 1996 AWLP compensation policy commencement date determined by the Special Referee. In addition, he argues that the 7,100 Terex shares were properly valued as of December 31, 2003. Andersen rejects Weinroth's claim regarding the accounting, and asserts that the Essar fraud claim was not duplicative of the contract claims. Andersen urges an affirmance of the court's determinations regarding the fraud claim, the characterization of the $300,000 payment as a loan, and the dismissal of Weinroth's counterclaim for unjust enrichment based upon the leasehold improvements.

In Weinroth's reply, he repeats all of his challenges to the Special Referee's calculations of fees, stocks and options owed by the partners to AWLP. He also restates his claim for an accounting prior to review of the merits of certain claims, and argues that the fraud, fraudulent concealment, and breach of fiduciary duty claims are duplicative of the Essar breach of contract claim. Finally, he reasserts that Andersen failed to prove all of the elements of his claims for fraud, fraudulent concealment, and breach of fiduciary duty.

■ The question of whether the Core Labs SERP was embraced within the directors' compensation policy must be answered in the negative. The SERP was awarded to Weinroth in 1997, after the compensation policy became effective. However, the uncontradicted evidence at the Special Referee's hearing was that the SERP was made to retroactively reward Weinroth and three other individuals for work they performed in 1994 and 1995 in connection with the buyout of Core Labs by its management and a subsequent initial public offering. Although the introductory language in the document creating the SERP states Core Labs' "desire to recognize the value to the Company of past *and present* services" (emphasis added), Core Labs' chief financial officer Bergmark testified that such language was included in a generic SERP document which Core Labs received from its counsel. Further, Bergmark explained that, in redrafting the form for the 1998 SERP participants, the

drafters paid little attention to that portion of the document. Also, we note that a recital paragraph in a document is not determinative of the rights and obligations of parties to the agreement (*see Mercury Bay Boating Club v San Diego Yacht Club*, 150 AD2d 82, 91 [1989], *affd* 76 NY2d 256 [1990]), nor does it prevent the introduction of parol evidence to explain the parties' intent (*see Musman v Modern Deb*, 56 AD2d 752 [1977]).

■ The July 5, 2005 valuation date employed by the Special Referee and confirmed by the IAS court is correct. Weinroth claims that since the various stocks and stock options were "passive" assets, the valuation date should have been closer to the hearing date. In doing so, Weinroth analogizes the situation here to divorce actions. He relies on the general rule that "passive" assets, that is, those whose value fluctuates on a daily basis dependent on factors outside of the owner's control, should be valued as of the date of the hearing for purposes of equitable distribution (*see Grunfeld v Grunfeld*, 94 NY2d 696, 707 [2000]). However, the cases hold that the active/passive distinction is merely a "helpful guidepost[ ]" which a court has the discretion to disregard where its use does not make sense (*see McSparron v McSparron*, 87 NY2d 275, 288 [1995]; *Naimollah v De Ugarte*, 18 AD3d 268, 270 [2005]). Here, the parties were both sophisticated financiers who knew that this question would be considered when the court referred the valuation issue to the Special Referee. The record provides no basis for disturbing the Special Referee's chosen valuation date, which was, in any event, only 2½ months prior to the commencement of the Special Referee's hearing.

■ The IAS court was correct in confirming that part of the Special Referee's report which did not include as AWLP property the 15,000 Terex options awarded to Andersen in April 1996. Weinroth argues that the directors' compensation policy became effective as early as March 22, 1996. Andersen counters that the policy became effective in June 1996. Because the record contains evidence supporting both positions, we defer to the Special Referee, who was in the best position to weigh the evidence and make credibility determinations (*see Hall v King*, 265 AD2d 244 [1999]).

The Special Referee was also correct in valuing 7,100 of the Terex shares as of December 31, 2003. Andersen contributed 7,900 of the 15,000 Terex shares to AWLP on that date, so that AWLP could raise cash to satisfy a debt. The shares had been realized in April 2002, when Andersen exercised all 15,000 of

the Terex options awarded to him in 1997. Pursuant to the directors' compensation policy, Weinroth could have demanded that Andersen contribute all of the realized shares to AWLP on December 31, 2003, but did not. Now Weinroth argues that the Special Referee should have valued the 7,100 shares as of July 5, 2005. However, that date was to apply to unrealized stock options. Because the 1997 options had all been realized by December 31, 2003, and because Weinroth could have demanded that Andersen contribute all of the shares realized from the 15,000 options on December 31, 2003, it was appropriate for the Special Referee to value them as of that date. We further note that Andersen's failure to contribute the additional 7,100 shares on December 31, 2003 was justified by the fact that the value of the shares on that day represented his cost of exercising all 15,000 options.

As to the Hovnanian options, Weinroth argues that the Special Referee improperly valued all of these options as if they vested during the period that the directors' compensation policy was effective. Indeed, two thirds of those options were not due to vest until after until December 31, 2002, which is when AWLP ceased to actively function. To determine this issue, we look to the Court of Appeals' decision in *DeJesus v DeJesus* (90 NY2d 643 [1997]) for guidance. There, the Court set forth a precise formula for determining what portion of unvested stock options is marital property. While this is not a divorce action, the *DeJesus* methodology applies here, where AWLP is analogous to a marital estate. The threshold question in *DeJesus* was whether the options were granted as a reward for past services, or as an incentive for future services. In the case of the former, one formula determines the distribution of options where the reward was partially for services performed before the marriage and partially for services performed during the marriage. In the case of the latter, another formula determines how to distribute the options where some of the future services were performed during the marriage and some had yet to be performed as of the dissolution of the marriage.

We first note that Weinroth is not precluded from arguing that only one third of the Hovnanian options was the property of AWLP. Andersen's position that the issue should have been pleaded as an affirmative defense was not preserved and lacks merit. However, it cannot be discerned from the record whether the 7,500 stock options granted to Weinroth in November 2001 were incentive options or compensation for past services, or

some combination of both. The same facts were present in *DeJesus*, and the Court stated that there was no "testimony or documentation from persons with knowledge of just how and why" the options came to be (*id.* at 651). Accordingly, as in *DeJesus*, the matter is remanded to the IAS court for such a determination. If the court decides that all or part of the options are for past services, it should then apply the *DeJesus* formula to determine what portion must be contributed to AWLP.

Weinroth argues that the IAS court prematurely awarded damages to Andersen because no accounting had yet been performed. Although we reject Andersen's assertion that Weinroth failed to preserve this issue, we disagree with Weinroth's argument. Relying primarily on *Mizrahi v Chanel, Inc.* (193 Misc 2d 1 [2001]), Weinroth asserts that an action at law may not be maintained by one partner against another until there has been a full accounting. However, *Mizrahi* is not controlling, and in any event, Delaware law, which both parties agree governs the affairs of AWLP, expressly provides that a partner *may* maintain an action against another partner prior to an accounting (Del Code Ann, tit 6, § 15-405).

Weinroth further argues that an accounting was a necessary predicate to judgment here, because it may have revealed that AWLP had enough assets to repay Andersen for his capital contributions, rendering his conduct innocuous. Moreover, Weinroth claims that he is not even an appropriate defendant because under Delaware law (Del Code Ann, tit 6, § 17-606 [a]) only AWLP can be liable to Andersen, as a creditor, for any excessive capital contributions he made.

Weinroth's arguments, however, disregard the fact that he was found liable to Andersen for breach of fiduciary duty, and for fraud and fraudulent concealment regarding both Essar and the capital accounts. Moreover, in arguing that only AWLP is a proper defendant, he relies on two cases, *Mizrahi* (*supra*) and *Cincinnati Bell Cellular Sys. Co. v Ameritech Mobile Phone Serv. of Cincinnati, Inc.* (1996 WL 506906, 1996 Del Ch LEXIS 116 [1996], *affd* 692 A2d 411 [Del 1997]), neither of which involved allegations of fraud and which do not control here. Weinroth engaged in deliberate malfeasance, for which he should be held individually accountable. Accordingly, we find that the IAS court properly awarded judgment in Andersen's favor. Weinroth did not, as Andersen argues, fail to preserve his claim that Andersen's fraud, fraudulent concealment and breach of fiduciary duty claims as related to Essar, should have been

dismissed as duplicative of the Essar breach of contract claim. However, Weinroth's claim still fails. Weinroth's liability with respect to Essar arose not only out of his status as a contracting party, but in connection with the fiduciary duty he undisputedly owed to Andersen and Rawlings. Accordingly, the tort claims can coexist with the contract claims (*see Apple Records v Capitol Records*, 137 AD2d 50 [1988]; *see also Rodin Props.-Shore Mall v Ullman*, 264 AD2d 367 [1999]).

■ Moreover, the record supports a finding that Weinroth was liable in fraud with respect to the misrepresentation by him in October 2002 that he had made a capital contribution of $53,000. The court was justified in holding that Andersen's fax to Weinroth informing him that he was matching the "contribution" was evidence that Andersen had been misled by Weinroth to believe that Weinroth had made a capital contribution and not, as Weinroth maintains, a deposit of directors' fees. In light of all of the other misrepresentations made by Weinroth, and the fact that the court consistently found Weinroth not to be credible, this was not an irrational conclusion.

The IAS court correctly held in Andersen's favor on the fraudulent concealment claim as it related to the capital accounts. Weinroth owed a fiduciary duty to Andersen and AWLP which was "sensitive and 'inflexible' " (*Birnbaum v Birnbaum*, 73 NY2d 461, 466 [1989]) in its requirement that Weinroth show absolute fidelity to Andersen and AWLP. Thus, Andersen was reasonably justified in relying on Weinroth's representations concerning his capital contributions without having to perform his own independent inquiries (*see TPL Assoc. v Helmsley-Spear, Inc.*, 146 AD2d 468, 471 [1989]). Even if Andersen did have a duty to investigate, there is sufficient evidence in the record for the IAS court to have concluded that whatever investigation he was capable of making would not have alerted Andersen to facts sufficient to avoid the fraud. This is particularly true given Weinroth's concerted efforts to conceal the true condition of the capital accounts.

The IAS court properly determined that the $300,000 payment Andersen made to Weinroth in October 2001 was a loan. While there are some infirmities in Andersen's position, there are also deficiencies in Weinroth's evidence on the issue. Paying proper deference to the IAS court's determination that Weinroth was not credible, the court had justification to find for Andersen on this issue.

■ Finally, the determination that Andersen was not unjustly enriched by the successor companies' enjoyment of the leasehold

improvements was correct. Weinroth voluntarily surrendered his interest in the lease, and did not assert any claim concerning the improvements until this litigation. Furthermore, Weinroth was freed from any obligations under the lease when he surrendered his interest therein. Moreover, he failed to offer any evidence concerning the value of the improvements. Recovery for unjust enrichment may only be had where it is justified by "broad considerations of equity and justice" (*see Paramount Film Distrib. Corp. v State of New York*, 30 NY2d 415, 421 [1972]). Under these circumstances, such considerations do not warrant a finding in favor of Weinroth.

Accordingly, the judgment, Supreme Court, New York County (Bernard J. Fried, J.), entered November 13, 2006, which, to the extent appealed from, confirmed the report of a Special Referee, except to the extent that the report recommended appointment of a receiver to oversee the winding up of plaintiff-appellant limited partnership, and which, after a nonjury trial, entered judgment in favor of the partnership and plaintiffs G. Chris Andersen and James Rawlings on the complaint's second, third, fourth, fifth and seventh causes of action, dismissed defendant's fifth, sixth and seventh counterclaims, and severed the eighth cause of action and ninth counterclaim for a Special Referee to hear and report, should be modified, on the law and the facts, to strike so much of it as required defendant-respondent-appellant Stephen Weinroth to pay to the partnership the value of stock options granted to him by Hovnanian Corporation in November 2001, but not yet vested as of December 31, 2002, and otherwise affirmed, without costs, and the matter remanded for further findings consistent herewith.

SAXE, SULLIVAN, CATTERSON and KAVANAGH, JJ., concur.

Judgment, Supreme Court, New York County, entered November 13, 2006, modified, on the law and the facts, to strike the provision requiring defendant-respondent-appellant to pay to the partnership the value of stock options granted to him by Hovnanian Corporation in November 2001, but not yet vested as of December 31, 2002, and otherwise affirmed, without costs, and the matter remanded for further findings consistent herewith.