# FOR PUBLICATION



FILED

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**RICHARD A. ROCAP**
Rocap Musser LLP
Indianapolis, Indiana

**BRADFORD S. MOYER**
**JEFFREY C. GERISH**
Plunkett Cooney
Kalamazoo, Michigan

ATTORNEYS FOR APPELLEE:

**BRENT W. HUBER**
**BRIAN J. PAUL**
Ice Miller LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| UNITED STATES FIDELITY and GUARANTY COMPANY, | ) | |
| | ) | |
| | ) | |
| Appellant/Cross-Appellee/Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A04-1203-CT-97 |
| | ) | |
| WARSAW CHEMICAL COMPANY, INC., | ) | |
| | ) | |
| Appellee/Cross-Appellant/Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable S.K. Reid, Judge
Cause No. 49D14-0710-CT-44027

**May 23, 2013**

**OPINION – FOR PUBLICATION**

**BRADFORD, Judge**

# INTRODUCTION[1]

Over the course of several decades, Appellee/Cross-Appellant/Plaintiff Warsaw Chemical Company ("Warsaw") released pollutants into the soil and groundwater at its Warsaw, Indiana facility. This contamination was discovered in the late 1980s, and Warsaw agreed to remediate in August of 1989. In 1990, Warsaw notified its general liability insurer, Appellant/Cross-Appellee/Defendant United States Fidelity and Guaranty Company ("USF&G"), of the contamination and that Warsaw was seeking reimbursement for the remediation pursuant to its primary and excess policies. USF&G notified Warsaw that it believed that coverage did not exist for a number of reasons and denied coverage pursuant to both primary and excess liability policies. In 1992, in exchange for $25,000, Warsaw released USF&G from claims or demands related to the remediation.

In 2007, Warsaw filed suit against USF&G, contending, *inter alia*, that the 1992 release only concerned primary liability policies. Over the course of the next few years, the trial court ruled that (1) the 1992 release did not bar coverage under the excess policies, (2) Warsaw's claim was not time-barred, and (3) coverage existed under the personal injury coverage of the excess policies. The trial court ultimately entered judgment in favor of Warsaw for $417,953.

USF&G contends that the trial court erred in ruling in Warsaw's favor because (1) the 1992 release executed by Warsaw covered the excess policies, (2) Warsaw's claim is

---

[1] We heard oral argument in this case on April 30, 2013. We would like to commend counsel from both sides on the extremely high quality of their oral advocacy.

2

time-barred, (3) coverage does not exist under the personal injury provisions of its policies with Warsaw, and (4) not all of Warsaw's costs were covered even if coverage did exist. Warsaw responds to all of these arguments and additionally claims that (1) the Court of Appeals should affirm for the alternate reason that coverage exists under the property damage provisions of the relevant policies and (2) Warsaw is entitled to prejudgment interest. Because we conclude that the 1992 release covered the excess policies, we reverse the judgment of the trial court and remand with instructions.

## FACTS AND PROCEDURAL HISTORY

Warsaw is located in Warsaw, Indiana, and is in the business of receiving and repackaging chemicals and manufacturing chemical products. From May 3, 1985, to May 3, 1989, Warsaw had primary liability policies with USF&G and had excess policies from May 3, 1985, to May 3, 1988. (Appellant's App. 45). In June of 1988, contractors installing a sewer trench 400 feet from Warsaw's facility encountered soil and groundwater that smelled of solvents. Samples taken at the site revealed the presence of 1,1,1 Trichloroethane; Ethylbenzene; Tetrachloroethylene; Toluene; Trichloroethylene; Xylene; Alkylbenzene; 1,2 Dichloroethane; 1,1 Dichloroethane; Methylene Chloride; Acetone; Methyl Isobutyl; Ketone; cis 1,2 Dichloroethane; and mixed alkanes. On October 26 and 27, 1988, the Environmental Protection Agency ("EPA") conducted testing, the results of which indicated groundwater contamination near a well field that supplied approximately one-third of the city's water. (Appellant's App. 71). On February 16, 1989, Warsaw's consultant sampled a monitor well and discovered an insoluble floating layer consisting of 30% Toluene; 25% Mineral Spirits; 21% Xylene;

3

14% 1,1,1 Trichloroethane; and lesser amounts of Trichloroethene and Tetrachloroethene. (Appellant's App. 71).

On September 12, 1989, the EPA and Warsaw issued an Administrative Order by Consent, which indicated that the conditions present at Warsaw "constitute[d] a threat to public health or welfare or the environment … due to the existence of heavily contaminated groundwater and soil." Appellant's App. pp. 74-75. Consequently, the order required Warsaw to investigate and remediate the contamination caused by its operations and cease further contamination. In a letter dated January 10, 1990, Warsaw notified USF&G of the contamination matter. (Appellant's App. 219). In a later dated January 9, 1991, USF&G denied coverage for the remediation under both its primary and excess liability policies with Warsaw. (Appellant's App. 219-20).

On June 22, 1992, Warsaw executed a Release and Settlement Agreement ("the Release"), in exchange for which USF&G paid Warsaw $25,000. The Release provides, in part, as follows:

WHEREAS, USF&G issued to Warsaw the following comprehensive general liability insurance policies for the following policy periods:

| Policy Number | Policy Period |
| --- | --- |
| ICP 07911442001 | 05/03/88-05/03/89 |
| ICC 090453055 | 05/03/87-05/03/88 |
| ICC 085149911 | 05/03/86-05/03/87 |
| ICC 069731717 | 05/03/85-05/03/86 |

….

NOW THEREFORE, Warsaw, by its duly authorized representative, agrees as follows:

1. In consideration for the payment of $25,000.00, receipt of which is hereby acknowledged, Warsaw releases, acquit[s], and forever discharges USF&G and its agents, representatives, parent organizations, subsidiaries, and all other persons, firms or corporations in privity with

4

USF&G from any further claims, demands, causes of action, damages, clean-up costs, expert fees, consulting fees, attorneys fees, costs or losses of any kind and nature whether known or unknown, foreseen or unforeseen, anticipated or unanticipated arising from, or in any way related to, the pollution and contamination of the soil and groundwater in, upon or adjacent to the Warsaw facility in Warsaw, Indiana.

Appellant's App. pp. 287, 289. The excess policies were not specifically mentioned in the Release.

On October 16, 2007, Warsaw filed suit against USF&G, contending that USF&G is obligated to defend and indemnify Warsaw pursuant to the excess polices. On December 23, 2009, the trial court denied USF&G's motion for summary judgment, rejecting USF&G's argument that the Release covered the excess policies as well as the primary policies. (Appellant's Br. 50). On February 4, 2010, the trial court denied USF&G's motion for summary judgment on the ground that Warsaw's claims were time-barred. (Appellant's Br. 53). On September 23, 2010, the trial court denied both parties' motions for summary judgment, concluding that there was a genuine issue of material fact as to whether there was an "occurrence" pursuant to the excess policies. (Appellant's Br. 59).

On December 28, 2010, the trial court ruled on Warsaw's motion to reconsider, concluding that coverage did, in fact, exist under the "personal injury" provisions of the excess policies. The trial court also found that Warsaw had already exceeded the $500,000 per occurrence coverage limit of the primary coverage. (Appellant's Br. 63-64). The trial court entered partial summary judgment in favor of Warsaw, concluding that (1) USF&G had a duty to defend Warsaw and that (2) coverage existed under the

5

personal injury provisions of the excess policies and that USF&G was to indemnify Warsaw for "all environmental response costs, legal defense costs, and any other future costs Warsaw Chemical sustains in the underlying environmental matter, less the policy limit of the underlying primary policy[.]" Appellant's Br. p. 64.

On February 3, 2012, the trial court entered its Order and Final Judgment. In the order, the trial court noted the parties' stipulations that Warsaw's total outlay for remediation had been $1,109,664.98, and Warsaw's costs prior to September of 1989 had been $191,711. (Appellant's Br. 67). The trial court concluded that Warsaw's $191,711 outlay prior to September of 1989 were defense costs for which USF&G was not liable and the remaining $917,953[2] of Warsaw's total outlay were indemnity costs. The trial court also found that Warsaw's coverage claim was not time-barred and that the primary coverage limit of $500,000 had been exceeded. The trial court entered judgment in favor of Warsaw for $417,953 but denied Warsaw's request for prejudgment interest.

## DISCUSSION

### Whether the Trial Court Erred in Denying USF&G's Summary Judgment Motion on the Basis that the Release Covered the Excess Policies

When reviewing the grant or denial of a summary judgment motion, we apply the same standard as the trial court. *Merchs. Nat'l Bank v. Simrell's Sports Bar & Grill, Inc.*, 741 N.E.2d 383, 386 (Ind. Ct. App. 2000). Summary judgment is appropriate only where the evidence shows that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Id.*; Ind. Trial Rule 56(C). All facts and

---

[2] When subtracting the defense costs from the total costs, the trial court did not include the $0.98 in the calculation.

reasonable inferences drawn from those facts are construed in favor of the nonmoving party. *Id.* To prevail on a motion for summary judgment, a party must demonstrate that the undisputed material facts negate at least one element of the other party's claim. *Id.* Once the moving party has met this burden with a prima facie showing, the burden shifts to the nonmoving party to establish that a genuine issue does in fact exist. *Id.* The party appealing the summary judgment bears the burden of persuading us that the trial court erred. *Id.* Where a different standard of appeal is to be applied, that will be noted.

USF&G argues that the Release unambiguously releases it from any and all claims related to contamination at Warsaw. USF&G claims that the listing of policies in the Release, which did not include the excess policies, does not render Warsaw's release ambiguous because the list appears in the preliminary recitals. Warsaw counters that the Release, including the recitals, should be read as a whole and that doing so leads to the conclusion that the Release only related to the primary polices, not the excess policies.

The disposition of this issue turns on the legal effect of operative language versus recitals, or "whereas" clauses, in a contract. "The first rule in the interpretation of contracts is to give meaning and effect to the intention of the parties as expressed in the language of the contract." *Stech v. Panel Mart, Inc.*, 434 N.E.2d 97, 100 (Ind. Ct. App. 1982). "In ascertaining the intention of the parties, a court must construe the instrument as a whole, giving effect to every portion, if possible." *Id.*

As the *Stech* court noted however, Indiana has long distinguished between operative contract language and recitals:

7

In *Irwin's Bank v. Fletcher, etc., Trust Co., Rec.* (1924), 195 Ind. 669, at 694, 145 N.E. 869, at 877, the Indiana Supreme Court stated:

> "The preliminary recitals in a contract may be persuasive in determining the intention of the parties thereto when the language expressing their contractual relations is ambiguous, uncertain and indefinite, but they should never be allowed to control, as here, the clearly expressed stipulations of the parties."

Citing *Irwin's Bank*, *supra*, the Indiana Supreme Court in *Kerfoot v. Kessener* (1949), 227 Ind. 58, at 79, 84 N.E.2d 190, at 199 held:

> "The preliminary recitals of the contract may be of some value, but they are not contractual, and can not be permitted to control the express provisions of the contract which are contractual in nature."

*Id.*

The distinction between recitals and operative language has not been questioned or criticized in this court or the Indiana Supreme Court, much less abrogated. As previously mentioned, the relevant operative language of the Release

> forever discharges USF&G and its agents, representatives, parent organizations, subsidiaries, and all other persons, firms or corporations in privity with USF&G from any further claims, demands, causes of action, damages, clean-up costs, expert fees, consulting fees, attorneys fees, costs or losses of any kind and nature whether known or unknown, foreseen or unforeseen, anticipated or unanticipated arising from, or in any way related to, the pollution and contamination of the soil and groundwater in, upon or adjacent to the Warsaw facility in Warsaw, Indiana.

Appellant's App. p. 289. Warsaw does not argue that this operative language is ambiguous, and the language clearly releases USF&G from "any further claims" related to pollution and contamination at the Warsaw facility, without reference to different types of insurance coverage. Under the binding precedent of *Irwin's Bank* and *Kerfoot*, the

recitals referencing only the primary policies may not be used to interpret the unambiguous operative language.[3]

Warsaw argues, essentially, that *Irwin's Bank* and *Kerfoot* are no longer good law and should not be followed. Citing to *OEC-Diasonics, Inc. v Major*, 674 N.E.2d 1312 (Ind. 1996), Warsaw argues that post-*Stech* Indiana Supreme Court precedent follows the general rule that a contract must be construed as a whole to divine the intent of the parties, which in Warsaw's view represents an implied rejection of *Irwin's Bank'*s and *Kerfoot'*s distinction between recitations and operative language. While it is true in *OEC-Diasonics* that the Court referred to recitation language in a release in its analysis, there are at least two reasons why the case does not help Warsaw. First, the issue of

---

[3] It is worth noting that this is consistent with the overwhelming weight of authority nationwide. Of the at least thirty federal jurisdictions and states that have addressed the issue, the vast majority have held that recitals do not control unambiguous operative language in contracts. *See e.g.*, *Grynberg v. F.E.R.C.*, 71 F.3d 413, 416 (D.C. Cir. 1995) ("[I]t is standard contract law that a Whereas clause, while sometimes useful as an aid to interpretation, cannot create any right beyond those arising from the operative terms of the document.) (citation omitted); *Burch v. Premier Homes, LLC*, 131 Cal. Rptr. 3d 855, 867 (Cal. Ct. App. 2011) ("In cases where there is 'any apparent conflict between its different clauses or provisions, the circumstances surrounding its execution and the conditions and motives of the parties as shown by recitals in the contract or matters in evidence should be taken into consideration in order that the true intent of the parties may be ascertained.'") (citation omitted); *Andersen ex rel. Andersen, Weinroth & Co., L.P. v. Weinroth*, 849 N.Y.S.2d 210, 219 (N.Y. App. Div. 2007) ("[W]e note that a recital paragraph in a document is not determinative of the rights and obligations of parties to the agreement[.]"); *Furmanite Worldwide, Inc. v. NextCorp, Ltd.*, 339 S.W.3d 326, 336 (Tex. App. 2011) ("Recitals in a contract are not strictly part of the contract, and they will not control the operative phrases of the contract unless those phrases are ambiguous.").

Seemingly, the only jurisdictions that arguably do not adhere to the proposition that recitals will not be used to interpret contracts in the absence of ambiguity are Arkansas, Illinois, and Wisconsin. *See Schnitt v. McKellar*, 427 S.W.2d 202, 206-07 (Ark. 1968) ("The 'whereas' clauses set forth the reasons or inducements for entering into a contract and must be considered in determining the true intentions of the parties thereto."); *Hagene v. Derek Polling Const.*, 902 N.E.2d 1269, 1274 (Ill. App. Ct. 2009) ("[W]e are instructed to give effect to all the relevant contractual language to resolve the question of the parties' intent. This includes the contract recitals in which the respondent indicated that it had paid all the medical bills, when in truth and in fact it had not. '[W]hile recitals are not [an] operational part of [a] contract between the parties, they reflect the intent of the parties and influence the way the parties constructed the contract.'") (citations omitted); *Levy v. Levy*, 388 N.W.2d 170, 175 (Wis. 1986) (concluding that "[t]he recital or whereas clause of a contract may be examined to determine the intention of the parties" without explicitly requiring ambiguity in the operative language.).

9

recitations versus operative language appears not to have been brought up or argued by either party. Indeed, *OEC-Diasonics* does not even mention—much less explicitly overrule or modify—*Stech*, *Irwin's Bank*, or *Kerfoot*.

Second, a close reading of *OEC-Diasonics* reveals that the Court used the recital language in question as an aid to interpreting operative language that was less than clear, which is entirely consistent with the holdings in *Irwin's Bank* and *Kerfoot*. To summarize the factual background of *OEC-Diasonics*, Major entered into a distribution agreement with OEC in 1969. *OEC-Diasonics*, 674 N.E.2d at 1313. In the early 1980s, OEC spun off its Medical Systems Division, for which Majors was also distributing product, as OEC Medical Systems ("OECMS"), a separate corporate entity, and both corporations then became wholly owned subsidiaries of the apparently-newly-formed OEC International. *Id*. at 1314. In 1983, Diasonics acquired OEC International, and, the next year, Biomet, Inc., acquired OEC while Diasonics continued to own OECMS, which changed its name to OEC-Diasonics. *Id*. At some point in or after 1984, OEC-Diasonics terminated its distributorship agreement with Majors. *Id*. Majors sued OEC-Diasonics over the contract dispute. *Id*. Majors also pursued federal litigation with OEC over a similar contract dispute, which resulted in a 1988 release negotiated with Biomet and OEC. *Id*.

In its litigation with Majors, OEC-Diasonics claimed that the 1988 release of Biomet and OEC, as it covered Biomet's and OEC's "successors," also applied to it because it was a successor of OEC, having spun off in 1983. *Id*. Paragraph fourteen of the release provided, *inter alia*, that the "'[a]greement shall inure to the benefit of, and

10

may be enforced by, and shall be binding on the parties hereto and respective assigns and successors in interest.'" *Id*. at 1315. The Court noted that paragraph 14 did not specify whether it was referring to the successors of OEC as it existed in 1969 (which would include OEC-Diasonics) or the successors of OEC as it existed at the time of the release (which would not). *Id*. Paragraph three, a recital, provided, in part, as follows: "'WHEREAS, a dispute has arisen between Biomet and [the plaintiff] arising out of their relationship and the notice of termination by Biomet of an Agreement originally entered into between Major and Orthopedic Equipment Company, Inc., ("OEC") on September 15, 1969…'" *Id*. (brackets in *OEC-Diasonics*). OEC-Diasonics apparently argued that this language indicated an intent to define OEC, for purposes of the release, as the entity that existed by that name in 1969. The Court, however, noted that the recital language only designated the date the parties entered into the distribution agreement. *Id*. The Court ultimately concluded that OEC-Diasonics was not a "successor" pursuant to the release. *Id*. at 1316.

Warsaw cites *OEC-Diasonics* as evidence that the Indiana Supreme Court has abandoned the holdings of *Irwin's Bank* and *Kerfoot*. It is apparent, however, that to the extent that the Court considered the recital language, it did so only because it found the operative language at issue to be less than completely clear, which is the only circumstance under which a court *may* consider recital language under *Irwin's Bank* and *Kerfoot*. Put another way, the OEC-Diasonics Court used the language in paragraph three, a recital, as an aid to interpret the language in paragraph fourteen, which contained operative language. The Indiana Supreme Court's approach in *OEC-Diasonics*, far from

11

repudiating the holdings in *Irwin's Bank* and *Kerfoot*, supports, and is entirely consistent with, them. We cannot accept Warsaw's argument that the Indiana Supreme Court's holding in *OEC-Diasonics* represents a departure from the rule laid out in *Irwin's Bank* and *Kerfoot*.

## CONCLUSION

The unambiguous operative language of the Release provided that Warsaw was releasing USF&G

> from any further claims, demands, causes of action, damages, clean-up costs, expert fees, consulting fees, attorneys fees, costs or losses of any kind and nature whether known or unknown, foreseen or unforeseen, anticipated or unanticipated arising from, or in any way related to, the pollution and contamination of the soil and groundwater in, upon or adjacent to the Warsaw facility in Warsaw, Indiana.

Appellant's App. p. 289. Recital language that arguably suggests that the release applied to only some of the insurance policies Warsaw had with USF&G does not trump this clear language. Because the Release covered the excess policies, the trial court erred in denying USF&G's summary judgment motion on this point. We therefore reverse the judgment of the trial court and remand for entry of summary judgment in favor of USF&G.[4]

We reverse and remand with instructions.

NAJAM, J., and FRIEDLANDER, J., concur.

---

[4] Because we conclude that the Release applied to the excess policies, we need not address any of USF&G's other direct appeal claims or any of Warsaw's cross-appeal claims.